## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

CORNELIUS B. PRIOR, JR.,

        Plaintiff,

   v.

TRUSTEES OF THE COLLEGE OF THE
HOLY CROSS,

        Defendant.

Case No. 4:23-cv-40116

## MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION TO COMPEL MEDIATION AND ARBITRATION, TO APPOINT A MEDIATOR AND ARBITRATOR, AND TO STAY FURTHER PROCEEDINGS

On February 28, 2014, Plaintiff Cornelius B. Prior, Jr. ("Mr. Prior" or "Plaintiff"), while a trustee of the College of the Holy Cross (the "College"), executed a formal, written pledge agreement (the "Agreement") to pay the College $25 million for the design, development, and construction of a new performing arts building on campus that would bear his name (the "Prior Performing Arts Center" or "PAC"). The terms and conditions of Mr. Prior's generous donation were memorialized in the Agreement, which had been extensively negotiated between the parties and their respective legal counsel. Per the Agreement, Mr. Prior committed to providing $25 million to fund the PAC according to a schedule of installment payments, the last of which was to occur after the College's receipt of a certificate of occupancy. The Agreement also provided for mandatory mediation, and then arbitration, in the event of a dispute over whether the College had satisfied the conditions for Mr. Prior's payments under the Agreement.

When the parties entered into the Agreement, the PAC's estimated project cost was $57 million. The College worked on the project closely with Mr. Prior, who had expansive approval

1

rights with respect to selection of the architect and design of the building. In large part because of the complex design of the PAC favored by Mr. Prior and the architectural firm, by July 2019, the estimated project cost had doubled from the original estimate, to $115 million. After management of all costs, the final project cost was $109 million. Relying on Mr. Prior's agreement to complete his $25 million pledge, the College entered into debt financings, which were approved by Mr. Prior in his capacity as a trustee, and solicited gifts from other donors, to secure the additional $84 million required to complete the PAC, all in close coordination with Mr. Prior.

In 2022, the spectacular three-story, 84,000-square-foot Prior Performing Arts Center opened and began regularly hosting classes and events, including events that Mr. Prior attended. However, following the College's receipt of the PAC's certificate of occupancy, Mr. Prior did not complete payment of the over $7 million due on his pledge under the Agreement. The College made several requests for Mr. Prior to fulfill the Agreement, to no avail. In communications with Mr. Prior in Fall 2022, the College sought clarity on Mr. Prior's timeline for completing his pledge and made clear its expectation that the pledge would be completed and paid in advance of its hosting a formal dedication event.

In response, Mr. Prior informed the College via email on November 7, 2022, that he would "pay not one dollar more" towards his commitment. He further emphasized that the matter should be addressed under the mediation and arbitration provision in the Agreement:

> Keep reading and you will find in Section 10 that very civilized paragraph suggesting that in case of a disagreement about payment [. . .] the parties engage in direct discussion, then go to mediation if such discussions fail and finally to arbitration should mediation and discussion fail.

On November 9, 2022, the College responded to Mr. Prior to convey its agreement that the parties should follow the process set forth in Paragraph 10 of the Agreement:

> We reached out to you for a call for the very purpose of having a collaborative direct discussion with you about the fulfillment of the remaining pledge installments as we believe that the College has met all of its obligations and met all of the milestones of the project. [ . . .] As you mentioned in your email, it seems the next step, as provided in our agreement, is to pursue mediation. We welcome this opportunity to work toward a resolution.

After this exchange, Mr. Prior acknowledged, in writing, the requirement to mediate or arbitrate at least **eight more times** between November 2022 and January 2023.

Before Mr. Prior's unequivocal statement that he would "pay not one dollar more" toward his pledge, the College had been working with him to plan a formal dedication event for the PAC. However, based upon this statement, the College made the difficult decision to postpone the event, while continuing to seek to reach a mutually acceptable resolution with Mr. Prior. The College's efforts included repeated communications for the better part of a year requesting direct discussions and/or mediation, in the hope of reaching mutually acceptable resolution of this matter. Rejecting these efforts, Mr. Prior filed this suit in clear violation of his obligation to engage in alternative dispute resolution.

The plain terms of the Agreement call for mediation and arbitration of any payment disputes, as acknowledged by Mr. Prior multiple times. Because Mr. Prior neglected to include the Agreement with his Complaint, the College has filed a copy herewith. Despite the binding mediation and arbitration clause in the Agreement, Mr. Prior has refused the College's multiple offers to engage in direct discussions or to pursue mediation and arbitration, most recently on September 25, 2023. Instead, Mr. Prior, through his Complaint, attempts to turn the parties' dispute on its head by recasting his undisputed failure to complete his commitment as a purported failure by the College to adhere to the agreed-to conditions of his pledge. Despite the absence of evidence or factual support for his claims, Mr. Prior requests (among other purported relief) a judicial declaration that he owes nothing further under the Agreement and is somehow

3

entitled to a full refund of his previous donations—even though the $109 million, 84,000-square-foot building bearing his name is completed and fully operational.

The Court should reject Mr. Prior's attempt to plead around the mediation and arbitration provision in the Agreement. His dispute with the College is clearly covered by that provision, as Mr. Prior has repeatedly acknowledged in writing. Accordingly, Defendant respectfully requests that the Court compel mediation and/or arbitration; stay this litigation pending the outcome of such mediation and/or arbitration, as required by the Agreement and the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 3-4; and establish an orderly procedure for the appointment of a mediator and/or arbitrator, accordingly.  See 9 U.S.C. § 5; Local Rule 16.4.

## BACKGROUND

### A.  The Parties

Mr. Prior is a sophisticated businessman and former attorney who graduated from Harvard Law School. He is an alumnus of the College and served on its Board of Trustees from 1997 through 2005, and again from September 2013 to June 2021. Upon information and belief, Mr. Prior resides in the U.S. Virgin Islands.

The College is a nonprofit undergraduate educational institution located in Worcester, Massachusetts. It is one of the nation's premier liberal arts colleges, with rigorous academic offerings, and a core commitment to faith and service in keeping with its Jesuit traditions.

The parties had long enjoyed a positive and trusting relationship. In the past, Mr. Prior has been a generous supporter of College initiatives and programming, particularly in the arts.[1]

---

[1] For example, he endowed multiple professorships and made regular contributions to the College's development efforts.

**B.  The Parties Enter into the Agreement, Under Which Mr. Prior Agrees to Donate $25 Million Toward the PAC and to Mediate and Arbitrate Any Disputes Relating to the Conditions for His Payments**

In 2013, Mr. Prior and the College began discussing the potential value of a performing arts center to the College's campus and academic programming. On February 28, 2014, after extended negotiations, the parties executed the Agreement. Declaration of Dorothy A. Hauver ("HD"), ¶ 2, Ex. 1. The Agreement was approved by the Executive Committee exercising the power of the Board on February 26, 2014, and the minutes reflecting the Executive Committee's action were approved by the College's Board of Trustees on May 3, 2014, in each case in accordance with the College's By-Laws. HD, ¶¶ 3-4, Exs. 2-4.

The Agreement is governed by Massachusetts law and includes a promise by the College to "establish a Center for the performing arts and related activities at the College." HD, Ex. 1, ¶¶ 1, 11. Subject to the Agreement's "terms and conditions," Mr. Prior promised to make a total of $25 million in payments for the project in accordance with a schedule set forth in Paragraph 6 of the Agreement ("Paragraph 6"). Id. at intro. para., and ¶ 6. Specifically, Paragraph 6 reads:

> The Donor has already given two million dollars for this project in 2012 and three million dollars in 2013.  The final $20 million will be funded in accordance with the following schedule:

| | |
|---|---|
| Due on the later of January 31, 2015 or 30 days after the completion of the following construction milestones: architect selected, contract signed, and site selected[.] | $5 million |
| Due on the later of January 31, 2016 or 30 days after certification by the College that it has commenced construction[.] | $5 million |
| Due on the later of January 31, 2017 or 30 days after certification by the College that it has been diligently and continuously prosecuting construction[.] | $5 million |
| Due on the later of January 31, 2018 or 30 days after construction has substantially been completed as | $5 million |

> evidenced by issuance by a certificate of occupancy
> by the applicable governmental authority[.]

The Agreement also specifies that any income generated from Mr. Prior's payments "[does] not reduce [his] obligation to pay . . . $25 million[.]" Id. at ¶ 8.

Per the Agreement, Mr. Prior was granted the right to have the PAC named after him and approval rights over "the final selection of the architect, site and overall design" for the project. Id. at ¶¶ 3, 5. Regarding resolution of disputes, the Agreement contained the following term:

> In light of the magnitude of this very generous pledge and of the substantial commitments being made by the Donor and the College in connection with this pledge, the Donor and the College agree that if an issue arises relating to whether ***any condition*** for making ***any payments described in Paragraph 6*** of the Agreement has been satisfied, and if the issue cannot be settled through direct discussions, the Donor and the College agree to endeavor to resolve the issue by mediation.  If the Donor and the College cannot agree as to whether ***a condition*** for making ***any payments described in Paragraph 6 of the Agreement*** has been satisfied, then such issue shall be settled by arbitration between the parties.

Id. at ¶ 10 (emphasis added) (the "Mediation and Arbitration Clause").

Importantly, while the scheduling of payment obligations is listed in Paragraph 6, numerous other "condition[s]" that the College agreed to in exchange for the pledge payments appear throughout the Agreement. The parties expressly acknowledged that the Agreement, once fully executed, "shall constitute a valid contract[.]" Id. at ¶ 11.

### C.  The College Fundraises for and Completes Construction of the $109 Million Prior Performing Arts Center in Accordance with the Agreement.

Mr. Prior began his second tenure as a member of the College's Board of Trustees on September 1, 2013. The parties signed the Agreement the following year, in February 2014. Thus, Mr. Prior was intimately familiar with both the Agreement and the College's plans for the PAC not only in his personal capacity, but also in his fiduciary capacity as a trustee—and he was kept well-informed of those plans and their progress in both capacities. For example, the Board

approved the Agreement and received regular updates from its Building & Grounds Committee regarding the development, design, and construction of all major capital projects, including the PAC. The Board also received regular updates from its Finance and Advancement Committees regarding fundraising commitments towards the individual fundraising requirement for each such project.[2] Mr. Prior was also kept apprised of the project by various members of College staff, including by providing him with webcam access to the construction site to view its progress in real time.

Mr. Prior had substantial input on, and approval over, both the selection of the architect for the PAC and the design of the building itself. While the PAC was originally forecasted to cost $57 million, estimated PAC expenses increased to $115 million by July 2019, in large part due the complex design from the acclaimed architecture firm that Mr. Prior favored and approved.[3] As a long-serving trustee, Mr. Prior was aware that the Board, through its trustees, exercises its fiduciary duty of fiscal responsibility when embarking on a large capital project. Thus, Mr. Prior was well aware that the College would not undertake construction of a major new building without having firm fundraising commitments totaling at least two-thirds of the

---

[2] For example, at meetings that Mr. Prior attended as a trustee, the Board expressly discussed and approved the requirement that each capital project must have two-thirds of its projected costs supported by committed fundraising before commencement of construction. Resolutions to proceed with construction adopted by the full Board, including Mr. Prior, include this two-thirds committed fundraising requirement for each individual project. Thus, Mr. Prior appears to be complaining of actions that he approved many years ago in his capacity as a trustee.

[3] As noted, when the Agreement was entered into by the parties, the preliminary estimated cost of the PAC was $57 million, at which time Mr. Prior's gift represented approximately 43% of the project costs. At the January 22, 2015, Board meeting which Mr. Prior attended, it was noted that the project cost was $62 million and the architect was engaged. At the January 30, 2016 Board meeting which Mr. Prior attended, the project cost estimate was $88 million. At the April 28, 2018 Board meeting which Mr. Prior attended, the estimate was $93.1M. Finally, at the July 19, 2019 Board meeting which Mr. Prior attended, the estimated cost of the project approved by the Board was $115 million.  The College's efforts to manage the project expenses resulted in a slightly lower final cost of $109 million.

estimated cost of such project.[4] Thus, although the College remained dedicated to completing the PAC, as project costs sharply increased, the College needed to raise substantial additional funds from donors and incur significant indebtedness to cover the cost of the project and was forced to delay groundbreaking until it had sufficient funds to do so.[5]

Despite the significant development challenge of securing $84 million dollars in financing for the PAC (nearly $50 million more than originally envisioned), the College remained committed to completing the project promptly. Mr. Prior continued to receive regular updates regarding the project by way of both individual outreach and formal presentations to the Board. Acknowledging the College's sustained progress in this regard, Mr. Prior made additional contributions towards his commitment in 2014, 2015, and 2016.  See Ex.1, ¶ 6.  Between 2012 and 2016, Mr. Prior was credited with $17,989,558 in payments from donations of both stock and cash (including payments pre-dating, but included for purposes of, the Agreement) toward the total pledged amount under the Agreement. (HD, ¶ 5.)  As contemplated by the Agreement, see id. at ¶ 8, all such funds and the income therefrom were applied only for PAC-related purposes.

Once the fundraising requirement had been met, the PAC's construction progressed at pace and—notwithstanding the complex challenges posed by COVID and related government restrictions—the College received the certificate of occupancy in August 2022. As completed, the stunning building is three stories high, with 84,000 square-feet of performance and gathering

---

[4] Plaintiff was a member of the Board when it approved development of a new athletic complex for the campus. The College steadfastly refrained from breaking ground for the complex until it had secured financing equivalent to two-thirds of the project's projected cost.  At no time was the athletic complex project a barrier to the PAC's development, as both were occurring simultaneously.

[5] The Agreement does not contain, nor did the parties agree at any other time to impose, deadlines of any kind for construction milestones for the PAC project. In fact, the only enforceable dates for milestones contained within the Agreement are those obligating Mr. Prior with respect to due dates for his payments. HD, Ex. 1, ¶ 6.

space. It is home to a 400-seat theater, 200-seat studio, media lab, extensive art gallery, and outdoor amphitheater, as well as innovative areas for teaching, study, and collaboration. Since opening, the PAC has hosted over 150 events. Indeed, the building bearing Mr. Prior's name has been heralded as a unique and extraordinary space for the collective celebration of the arts.

### D. Mr. Prior Fails to Complete His Pledge, Refuses to Either Mediate or Arbitrate, and Files this Court Action, All in Violation of the Agreement.

In June 2022, the College received a temporary certificate of occupancy ("COO") for the PAC and anticipated being issued the final COO soon thereafter. Because the Agreement provides that Mr. Prior's final payment was "[d]ue" "30 days after . . . issuance [of] a certificate of occupancy by the applicable governmental authority," id. at ¶ 6, the College reached out to Mr. Prior on June 28, 2022, to remind him of the upcoming milestone, which, in turn, would require payment of his full commitment under the Agreement. Mr. Prior rejected that outreach and indicated that he did not intend to complete his full pledge.

On September 7, 2022, the College informed Mr. Prior of the receipt of the PAC's COO. DH, ¶ 6.  Two days later, Mr. Prior toured the PAC and attended a formal reception in the space to celebrate its opening. Still, he did not fulfill his pledge. Then, thirty-four days after providing notice to Mr. Prior of the COO, on October 11, 2022, the College reminded him via email that his outstanding balance was due, per the terms of the Agreement. He failed to pay at that time, as well. On November 3, 2022, Mr. Prior attended a play at the PAC. Notably, he did not communicate any difficulties with arranging for payment to complete his pledge in accordance with terms of the Agreement during this period.

By early November 2022, the College had, for nearly a year, been planning a formal dedication event at the PAC on December 16, 2022. Given the parties' longstanding relationship, the College had not anticipated that Mr. Prior would withhold over $7 million in unpaid pledge

amounts and was unsure about holding a formal dedication event for a donor who had indicated

that he would not complete his agreed-to pledge. The College again endeavored to reach an

understanding with Mr. Prior through a telephone call on November 4, 2022. During that call,

the College communicated to Mr. Prior that it was considering postponing the dedication event if

Mr. Prior needed more time to complete his pledge and inquired whether the outstanding funds

would be paid before the College needed to communicate the postponement. In response, on

November 7, 2022, Mr. Prior confirmed by email that he would "pay [the College] not one dollar

more."[6] Upon receiving that message, the College made the difficult decision to postpone the

event, which is now scheduled to occur in May 2024. At no time did the College threaten to

remove Mr. Prior's name from the PAC or permanently cancel the event.[7]

In his November 7, 2022 email, Mr. Prior acknowledged that the Agreement required that

"the parties engage in direct discussion, then go to mediation if such discussions fail[,] and

finally to arbitration should mediation and discussion fail." The College responded welcoming

Mr. Prior's suggestion and seeking to engage in mediation. On November 9, 2022, Mr. Prior

wrote, "We should be able to work on this problem rationally and privately.  If that fails, we

agree to arbitration." On November 17, 2022, Mr. Prior wrote, "I am moving to mediation and

have engaged counsel for the effort." Two days later, he followed up with a message in which he

discussed "the requirement for mediation and arbitration" in the parties' Agreement. Over the

---

[6] The College has not submitted the email communications cited herein to avoid the publication of potentially sensitive private information of the donor. To the extent the Court requests submission of these communications (which the College does not believe is necessary for the Court to conclude that mediation and arbitration must be compelled), the College can do so under seal or as the Court may otherwise order.

[7] On November 10, 2022, in an admission that undercuts the entirety of his Complaint, Mr. Prior wrote to the College that he "wish[ed] to reaffirm [his] commitment of $25 million to the College" for the PAC, but he asserted that personal liquidity issues prevented his making a payment at that time. He proposed a security arrangement involving shares in his former company, ATN International, Inc. The College expressed willingness to engage the proposed security arrangement and made multiple attempts to reach Plaintiff's attorney for that purpose. Mr. Prior nearly immediately withdrew that proposal.

course of the following months—and throughout 2023—the College attempted to resolve any disagreements with Mr. Prior pursuant to direct discussions and/or through offered mediation in accordance with the Mediation and Arbitration Clause. Yet, despite the College's repeated requests for mediation and arbitration, and Mr. Prior's own initial, repeated insistence that the Mediation and Arbitration Clause governs his disputes with the College, he has refused to actually engage in mediation or arbitration.[8]

Instead, repudiating the Mediation and Arbitration Clause, Mr. Prior filed the present Complaint on September 13, 2023. In it, Mr. Prior repeatedly alleges that the College did not fulfill payment "conditions" described in the Agreement (see, e.g., Complaint ("Compl."), ¶¶ 24, 32, 55)  and demands not only a judicial declaration that he owes nothing further, but also the return of the entirety of the funds he has donated for the PAC (Compl., p. 15), which have already been expended toward the design, development, and construction of the $109 million, 84,000-square-foot building named for him. The issues raised and relief requested in the Complaint are clearly subject to the Mediation and Arbitration Clause in the Agreement. Because Mr. Prior refuses to mediate and arbitrate accordingly, the College has filed this motion requesting that the Court compel him to do so.

## ARGUMENT

**A. The Court Should Compel Mediation and Arbitration Pursuant to the Federal Arbitration Act Because the Mediation and Arbitration Clause Is Enforceable and Covers the Parties' Disputes.**

The Federal Arbitration Act ("FAA") provides that private arbitration agreements are "valid, irrevocable, and enforceable," 9 U.S.C. § 2, and courts are "require[d] . . . to enforce"

---

[8] For example, most recently, on September 21 and 22, 2023, in advance of filing the present motion, the College requested in writing that Mr. Prior agree to mediate or arbitrate his disputes. Mr. Prior's counsel rejected both requests.

them. Barbosa v. Midland Credit Management, Inc., 981 F.3d 82 (1st Cir. 2020). "The Supreme Court has stated that the FAA was designed to promote arbitration [and] embodies the national policy favoring arbitration[.]" Soto-Fonalledas v. Ritz-Carlton San Juan Hotel Spa & Casino, 640 F.3d 471, 474 (1st Cir. 2011).

First Circuit district courts look to the FAA when considering motions to compel mediation, arbitration, or both. See RGOI ASC, LTD v. General Electric Co., No. CV 18-12624-RGS, 2019 WL 1992436 *2 (D. Mass. May 6, 2019); Hong Kong Juno Int'l Co. v. Advanced Renewable Energy Co., LLC, No. 12-CV-232-SM, 2013 WL 214380, at *3 (D.N.H. Jan. 18, 2013). Under the FAA, "[w]hen an enforceable [alternative dispute resolution] agreement exists between the parties, a court may enforce that agreement by staying existing litigation pending [alternative dispute resolution], 9 U.S.C. § 3, [and] compelling the parties to arbitrate [or mediate . . .], 9 U.S.C. § 4." Bekele v. Lyft, Inc., 199 F.Supp.3d 284, 293 (D. Mass. 2016); see also Hong Kong Juno Int'l Co., 2013 WL 214380, at *3. Under both FAA sections 3 and 4, the moving party must demonstrate four elements: (1) the existence of a valid agreement to mediate or arbitrate; (2) the entitlement to invoke the mediation or arbitration clause; (3) that the other party is bound by the mediation or arbitration clause; and (4) that the asserted claims are within the scope of the mediation or arbitration clause. Campbell v. Gen. Dynamics Gov't Sys. Corp., 407 F.3d 546, 552 (1st. Cir. 2005). All four of these elements are readily established here, and this Court should therefore compel mediation and arbitration and stay these proceedings until such mediation and arbitration have been completed, in accordance with the Mediation and Arbitration Clause. See Biller v. S-H OpCo Greenwich Bay Manor, LLC, 961 F.3d 502, 508 (1st

Cir. 2020) ("[T]he court has to send the dispute to arbitration" if movant demonstrates applicability of all four elements).[9]

### 1.   The Parties Entered into a Valid Agreement to Mediate and Arbitrate.

"[G]eneral principles of state contract law control the determination of whether a valid agreement exists." Campbell, 407 F.3d at 552. Applying Massachusetts law, a valid mediation and arbitration agreement exists where the parties had a "present intention to be bound by [such] agreement." Situation Management Systems, Inc. v. Malouf, Inc., 430 Mass. 875, 878 (2000).

Here, Plaintiff, who is an attorney and sophisticated businessman, signed the Agreement after extensive negotiations with the College involving each party's respective legal counsel. The terms of the Agreement not only include the Mediation and Arbitration Clause, but also an express provision that, upon execution, the parties were entering into "a valid contract." HD, Ex. 1, ¶¶ 10-11. Moreover, the allegations in Plaintiff's Complaint—which purport to allege what the College did and did not "agree[]" to do—demonstrate Plaintiff's acknowledgment that the Agreement, as a whole, is a valid, enforceable agreement. See, e.g., Compl., ¶ 51. Thus, as an express and binding term within the written Agreement, the Mediation and Arbitration Clause is likewise valid and enforceable.

### 2.   The College Is Entitled to Invoke the Mediation and Arbitration Clause of the Agreement.

The College is a party and signatory to the Agreement, which includes the express provision that its terms "shall . . . inure to the benefit of" the College.  HD, Ex. 1, ¶ 11. As such, it is entitled to invoke the Mediation and Arbitration Clause.  Cf., e.g., Restoration Preservation

---

[9] The Massachusetts Uniform Arbitration Act (the "MAA"), G.L. c. 251, *et seq.*, is also applicable here, consistent with the Agreement's Massachusetts choice-of-law clause. The Massachusetts Supreme Judicial Court has determined that, "[i]n all relevant respects, the language of the FAA and the MAA providing for enforcement of arbitration provisions are similar," McInnes v. LPL Financial, LLC, 466 Mass. 256, 260 (2013).  Accordingly, the Court can and should reach the same result under either statutory framework. See M.G.L. c. 251, § 2.

Masonry, Inc. v. Grove Europe Ltd., 325 F.3d 54, 62 n. 2 (1st Cir. 2003) (non-signatories to

agreement not generally entitled to seek arbitration thereunder).

### 3. Plaintiff Is Bound by the Mediation and Arbitration Clause of the Agreement.

Generally, "in the absence of fraud, one who signs a written agreement is bound by its

terms[.]" Greene v. Ablon, 794 F.3d 133, 146 (1st Cir. 2015) (quoting Spritz v. Lishner, 355

Mass. 162, 164 (1969)). Plaintiff is a party and signatory to the Agreement, which includes the

express provision that its terms "shall be binding upon" him. HD, Ex. 1, ¶ 11. Plaintiff does

not—and cannot—allege any facts that constitute fraud or that might otherwise render the

Mediation and Arbitration Clause unenforceable against him. The Mediation and Arbitration

Clause is binding on him and enforceable.  Cf. e.g. Grand Wireless, Inc. v. Verizon Wireless,

Inc., 748 F.3d 1, 9 (1st Cir. 2014) (noting arbitration agreements generally "cannot bind a non-

party").

### 4. Plaintiff's Claims Fall Within the Scope of the Mediation and Arbitration Clause.

Whether or not Plaintiff's claims are within the scope of the Mediation and Arbitration

Clause is a matter of federal law. See United States ex rel. Hagerty v. Cyberonics, Inc., 146

F.Supp.3d 337, 347 (D. Mass. 2015). Generally, when interpreting contractual clauses, courts

"consider the contract as a whole. . . .  Not only must due weight be accorded to the immediate

context, but no part of the contract is to be disregarded." Farmers Ins. Exchange v. RNK, Inc.,

632 F.3d 777, 785 (1st Cir. 2011) (interpreting agreement governed by Massachusetts law)

(internal citations and punctuation omitted). Providing guidance with respect to this analysis

under the FAA, the Supreme Court has stated:

> [I]t has been established that where [a] contract contains an arbitration clause, there is a
> presumption of arbitrability in the sense that an order to arbitrate the particular grievance

should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.

AT&T Technologies, Inc. v. Communications Workers of Am., 475 U.S. 643, 650 (1986).

Here, the parties' Agreement provides:

In light of the magnitude of this very generous pledge and of the substantial commitments being made by the Donor and the College in connection with this pledge, the [parties] agree that if an issue arises relating to whether *any condition* for making *any payments described in Paragraph 6* of the Agreement has been satisfied, and if the issue cannot be settled through direct discussions, the [parties] agree to endeavor to resolve the issue by mediation.  If the [parties] cannot agree as to whether *a condition* for making *any payments described in Paragraph 6 of the Agreement* has been satisfied, then such issue shall be settled by arbitration between the parties.

HD, Ex. 1, ¶ 10 (emphasis added). A natural and holistic reading of the Mediation and Arbitration Clause compels the conclusion that the parties agreed to a mandatory, three-tier escalating dispute resolution structure that first requires the parties to attempt direct discussions, then to proceed to mediation, and then, if mediation fails, to proceed to arbitration. The provision only makes sense when properly understood in this way; otherwise, it would appear to mandate simultaneous engagement in two separate, parallel procedures (mediation and arbitration) when faced with any unresolved dispute. This latter construction would generate an absurd and unreasonable result. See State Police Ass'n of Massachusetts v. C.I.R., 125 F.3d 1, 4 (1st Cir. 1997) ("Words must be read in context. . . . The law, in turn, should be reluctant to insist that courts construe a document in a way that leads to an absurd or nonsensical result").

The Mediation and Arbitration Clause is clear that it applies to any issue that "arises relating to" the satisfaction of any "condition" to making "the payments described in Paragraph 6," with no reference as to where in the Agreement any such "condition" appears. The use of phrases such as "relat[ing] to" "indicate an intent to arbitrate a broad scope of claims." United States ex re. Hagerty v. Cyberonics, Inc., 146 F.Supp.3d 337, 348 (D. Mass. 2015). The term

"payment**s** described in Paragraph 6" (emphasis added) evidences the parties' intent that the Mediation and Arbitration Clause was intended to apply to any Agreement conditions that relate to the milestone payments, individually or collectively. It is not limited, as the Plaintiff will likely argue, only to the particular milestones described in Paragraph 6.

To the extent that the Plaintiff advances a narrow reading of the scope of the Mediation and Arbitration Clause as limited only to milestones outlined in Paragraph 6, the issues raised by his allegations and claims are still subject to mediation and arbitration. Those milestones include: the timing and commencement of PAC construction; the "diligent[] and continuous[] prosecuti[on]" of PAC construction; and the timing of the PAC's substantial completion. HD, Ex. 1, ¶ 6. Plaintiff's Complaint asserts allegations and claims that "relate[] to" **all** of these provisions. Indeed, the gravamen of Plaintiff's Complaint is his claim that the College "induc[ed] him" to make payments pursuant to the Agreement even though—Plaintiff now claims, years later—the milestones set forth in Paragraph 6 and conditions in Paragraph 8 for those payments had not been met. Compl. ¶ 1. Moreover, Plaintiff's description of the "Nature and Summary of [His] Action" includes his allegations that the College "significantly delay[ed] development of [the] PAC"; "refused to honor its agreement to move forward with the PAC"; and retained his payments "during the College's long delay." Again, all of those allegations arise from and relate directly to the payment schedule set forth in Paragraph 6.  See Compl. ¶¶ 1-2.

Plaintiff underscores the point in alleging that the College violated the Agreement by way of failure "to pursue prompt and continuous development of the PAC," using substantially similar words as appear in Paragraph 6. Id. at ¶ 3. He also challenges the manner in which the College "h[eld] his money for seven years before even commencing construction of the PAC[,]" which likewise relates to the progress the College had been making towards certain construction

milestones when he provided his payments. See id. at ¶ 4. And critically, Plaintiff's overarching demand is for "the remittance of the full amount" of the payments he made to the College pursuant to the Agreement and a declaration that he owes nothing further thereunder.  Id. at ¶ 5; see also ¶ 32 and p. 15, Requests for Relief, ¶ (e). Such payments, which Plaintiff now wants refunded, were indisputably made according to (or, at the very least, "relating to") the schedule set forth in Paragraph 6. Indeed, Plaintiff expressly alleges that the milestone payments he made to the College were "in reliance upon its promises" set forth throughout the Agreement. Id. at ¶ 23. For these reasons, both the core allegations and ancillary claims that make up Plaintiff's Complaint "relat[e] to" the payment schedule set forth in Paragraph 6 of the Agreement, and therefore fall within the scope of the Mediation and Arbitration Clause, even under any narrower interpretation Plaintiff will likely seek to impose.

Moreover, the Mediation and Arbitration Clause expressly references "the substantial commitments being made by the Donor and the College in connection with this pledge," which "commitments" can only refer to the overall "condition[s]" the College was required to meet and the payment obligations Mr. Prior agreed to undertake if the College did so. HD, Ex. 1, ¶ 10. See also Bank One Texas, N.A. v. A.J. Warehouse, Inc., 968 F.2d 94, 98 (1st Cir. 1992) (contracts must be "construed so as to give reasonable effect to each of its provisions"). For example, such conditions included that the College deposit all pledged funds in a segregated account and to use them solely for development of the PAC (see id. at ¶ 8), which Plaintiff's Complaint specifically challenges. See, e.g., Compl. ¶ 51. Plaintiff's allegations, therefore, are wholly within the scope of the Mediation and Arbitration Clause, and the issues must be mediated and/or arbitrated pursuant to the parties' binding and enforceable Agreement.

Even if, *arguendo*, there were doubt (and there is not), the FAA reflects "a liberal federal policy favoring arbitration agreements." Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24-25 (1983). Indeed, "[t]the Arbitration Act establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." Id. The Supreme Court has made clear that "where an agreement to arbitrate some issues exists, and there is a dispute over the scope of the arbitration agreement, the law requires that those matters be presumed to be arbitrable 'unless it is clear that the arbitration clause has not included them.'" Bossé v. New York Life Ins. Co., 992 F.3d 20, 31 (1st Cir. 2021) (quoting First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 945 (1995)).

Here, although the counts Plaintiff lists in his Complaint include labels such as breach of fiduciary duty, accounting, and declaratory judgment, the actual allegations listed throughout the body of the pleading, Plaintiff's own description of the substance and nature of his purported grievances, and his actual Requests for Relief reveal that his claims predominantly—if not entirely—revolve around whether the College met the milestones listed Paragraph 6 and satisfied the conditions for payment found elsewhere in the Agreement. Indeed, if the parties had wanted to carve out certain payment conditions from the scope of the Mediation and Arbitration Clause, they certainly could have done so expressly. They did not.

Because the Mediation and Arbitration Clause encompasses virtually all issues and claims asserted in the Complaint, Plaintiff must submit his claims to mediation and/or arbitration. The Complaint was filed in violation of the Mediation and Arbitration Clause, and

18

the FAA mandates a stay of these proceedings or an order compelling meditation and/or arbitration. <u>See</u> 9 U.S.C. §§ 3-4.

> **B. The Court Should Order a Procedure for Selecting/Appointing a Mediator, Arbitration Forum/Venue, and Arbitrator, and Should Otherwise Stay This Proceeding Pending Completion of Those ADR Processes.**

This Court has authority to appoint a mediator and arbitrator, and the Local Rules provide the Court with flexibility for doing so. <u>See</u> 9 U.S.C. § 5; Local Rule 16.4. Here, the Mediation and Arbitration Clause, though binding on the parties, sets forth no details regarding the mediation or arbitration forum/venue, nor any specific method to choose a mediator or arbitrator. <u>See</u> HD, Ex. 1, ¶ 10. Therefore, the College respectfully requests that the Court order the parties to confer regarding each of these items and to file a joint report with the Court after a 14-day period summarizing the parties' agreements, disagreements, and/or a narrowed list of mutually acceptable options for mediator, arbitration forum/venue, and arbitrator, from which the Court may choose and make appropriate referral orders.

In all other respects, this action should be stayed pending completion of mediation and, if mediation fails to resolve the matter, arbitration. Indeed, the FAA "***requires*** a federal court in which suit has been brought 'upon ***any issue referable to arbitration*** under an agreement in writing for such arbitration' to stay the court action pending arbitration once it is satisfied that the issue is arbitrable under the agreement." <u>Large v. Conseco Fin. Servicing Corp.</u>, 292 F.3d 49, 52 (1st Cir. 2002) (emphasis added) (quoting <u>Prima Paint Corp. v. Flood & Conklin Mfg. Co.</u>, 388 U.S. 395, 400 (1967) (quoting 9 U.S.C. § 3)). The language of the FAA and the above-cited case law indicate that a stay is mandatory when any issues are found to be arbitrable. <u>See</u> <u>id.</u> Accordingly, this Court should stay this action following the selection of a mediator, arbitration forum and venue, and arbitrator so that the parties can promptly pursue the alternative dispute

resolution processes they agreed to. See Moses H. Cone Mem'l Hosp., 460 U.S. at 22 (moving parties out of court and into arbitration should occur "as quickly and easily as possible").[10]

## CONCLUSION

For the foregoing reasons, Defendant Trustees of the College of the Holy Cross respectfully requests that this Court grant its motion and enter an order that (1) compels mediation and, if mediation is unsuccessful, arbitration of the parties' disputes; (2) establishes a procedure for the parties to choose, or the Court to appoint, a mediator, arbitrator, and an appropriate forum/venue for mediation and arbitration, as set forth in the motion; and (3) otherwise stays this litigation pending the completion of mediation and any arbitration of the parties' disputes.

Respectfully submitted,

TRUSTEES OF THE COLLEGE OF THE HOLY CROSS,

By its Attorneys,

/s/ Joseph L. Bierwirth, Jr.
Joseph L. Bierwirth, Jr. (#BBO 564071)
Meaghan E. Borys (BBO #690943)
HEMENWAY & BARNES LLP
75 State Street, 16th Floor
Boston, MA 02109
(617) 227-7940
jbierwirth@hembar.com
mborys@hembar.com

Dated: September 29, 2023

---

[10] Even if, *arguendo*, the Court were to determine that not all issues are arbitrable, the Court should still stay the entire action. "The court has discretion to stay litigation pending the outcome of arbitration in the interest of maximizing judicial economy and avoiding piecemeal litigation." Johnson & Johnson Int'l v. Puerto Rico Hosp. Supply, Inc., 258 F. Supp. 3d 255, 265 (D.P.R. 2017) (internal quotes and citation omitted). Where "resolution of some claims in arbitration may shed light on the remaining nonarbitrable issues and to avoid inconsistent judgments, it is in the interest of justice to stay all claims pending arbitration." Id. Here, for the same reasons, whether the Court finds the entire Complaint to be subject to mandatory mediation and arbitration (as it should), or only certain claims and/or issues, the interests of justice require a stay of all proceedings pending the outcome of mediation and, if necessary, arbitration.

## **CERTIFICATE OF SERVICE**

I hereby certify that on September 29, 2023, I filed the foregoing document using the CM/ECF system, which sent notification of such filing to counsel of record in this matter.


*Joseph L. Bieriwirth, Jr.*
Joseph L. Bierwirth, Jr.