UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| CORNELIUS B. PRIOR, JR.,<br>      Plaintiff,<br><br>v.<br><br>TRUSTEES OF THE COLLEGE<br>OF THE HOLY CROSS,<br>      Defendant. | CIVIL ACTION<br>NO. 4:23-cv-40116-MRG |

**ORDER**

**January 24, 2025**

Hennessy, M.J.

By order of reference dated May 23, 2024, pursuant to 28 U.S.C. § 636(b)(1)(A) (Docket #17), this matter was referred to me for an order on Defendant Trustees of the College of the Holy Cross' (the "College" or "Holy Cross") motion to compel mediation and arbitration, to appoint a mediator and arbitrator, and to stay further proceedings (Docket #5). Plaintiff Cornelius B. Prior, Jr. opposed the motion (Docket #10) and the College filed a reply to the opposition (Docket #20) to which Prior filed a sur-reply (Docket #21). A hearing on the motion was held on August 2, 2024, and continued to October 31, 2024. (Dockets #27, 44). For the reasons that follow, the motion is hereby ALLOWED and the case is hereby STAYED.

I.       FACTUAL BACKGROUND[1]

Prior is a 1956 graduate of Holy Cross and a 1962 graduate of Harvard Law School. (Docket #1 at ¶ 13). Before retiring in 2017, Prior had a successful career as a lawyer, banker, and telecommunications industry executive. (Id. at ¶¶ 12-13). Prior served on the Holy Cross Board of Trustees from 1997 through 2005, and again from September 2013 to June 2021. (Id. at ¶ 17; Docket #6 at 4; Docket #11-1 at 1; Docket #11-3 at 2).

Consistent with his commitment to furthering the arts, humanities, and access to higher education, Prior has made a series of charitable donations to Holy Cross over the years. (Docket #1 at ¶ 15). In 1998, Prior donated $5 million, at the time Holy Cross' largest single donation, to establish three professorships. (Id. at ¶ 16). In 2006, as part of the celebration of his 50th Class Reunion, Prior donated an additional $5 million to expand the professorship endowments. (Id. at ¶ 18). Prior also provided additional donations to Holy Cross including gifts in support of exhibitions at the school's art gallery. (Id. at ¶ 19).

In 2012, the President's Advisory Council, of which Prior was a member, received a faculty presentation and tour identifying a material need for an on-campus performing arts center ("PAC"). (Id. at ¶ 20). The President's Advisory Council formally endorsed the faculty's priority

---

[1] In support of its motion, the Trustees have submitted the Declaration of Dorothy H. Hauver and exhibits thereto (Docket #6-1), the Supplemental Declaration of Hauver (Docket #20-1), the Declaration of Joseph L. Bierwirth, Jr. (Docket #20-2), photographs of the Prior Performing Arts Center groundbreaking (Docket #57-1), draft Meeting Minutes dated July 19, 2019 of the Trustees (Docket #57-2), a July 26, 2013 letter and enclosures sent from Prior to the then-President of Holy Cross (Docket #57-3), a July 23, 2018 email chain between Prior and Tracy Barlok (Docket #57-4), a November 10, 2022 email sent from Prior to Helen W. Boucher (Docket #57-5), and an October 23, 2013 email from Prior to Charles Weiss (Docket #57-6). Prior has submitted his own Affidavit and exhibits thereto (Docket #11), the Affidavit of Steven M. Crowley and exhibits thereto (Docket #12), his own Declaration (Docket #22), and a February 14, 2013 article from the Worcester Telegram & Gazette (Docket #56-1). On a motion to compel arbitration, the court may properly consider these documents. See Soto v. State Indus. Products, Inc., 642 F.3d 67, 72 n.2 (1st Cir. 2011) (arbitration agreements may be considered in connection with a motion to compel arbitration pursuant to the Federal Arbitration Act, 9 U.S.C. § 4, without treating the motion as one for summary judgment); cf. Ouadani v. Dynamex Operations E., LLC, No. 16-12036-PBS, 2017 WL 1948522, at *1 n.2 (D. Mass. May 10, 2017) ("The First Circuit has not stated what standard the movant should be held to at [a motion to compel arbitration], although some courts have applied a summary judgment standard.").

and recommended it to the Holy Cross Board of Trustees. (Id.). The Board of Trustees subsequently determined instead to prioritize and pursue funding for a major athletic facility that Prior did not consider to be as integral to the College's liberal arts academic mission. (Id.). In an effort to persuade Holy Cross to change that decision or to at least prioritize development of a PAC in addition to an athletic facility, Prior offered to donate $25 million to support the development of a PAC should the College use that money to move forward as promptly as possible with such a project. (Id.).

A written pledge agreement was prepared and signed by the parties in the form of a letter dated February 28, 2014 (the "Pledge Letter"). (Id. at ¶ 22). In the Pledge Letter, Prior pledged $25 million to the College to fund the construction and naming of a PAC. (Docket #6-1 at ¶ 5). Paragraph 6 of the Pledge Letter acknowledges that Prior had already donated $2 million in 2012 and $3 million in 2013 and set forth the following schedule for the final $20 million in payments:

| | |
|---|---|
| Due on the later of January 31, 2015 or 30 days after the completion of the following construction milestones: architect selected, contract signed, and site selected | $5 million |
| Due on the later of January 31, 2016 or 30 days after certification by the College that it has commenced construction | $5 million |
| Due on the later of January 31, 2017 or 30 days after certification by the College that it has been diligently and continuously prosecuting the construction | $5 million |
| Due on the later of January 31, 2018 or 30 days after construction has substantially been completed as evidenced by issuance by a certificate of occupancy by the applicable government authority | $5 million |

(Id. at ¶ 6). The Pledge Letter provided that these funds would be held in a segregated account, the income and principal of which would be expended exclusively to pay the costs of designing, financing, constructing, and equipping the physical facilities of the PAC. (Id. at ¶ 7). The income

3

from the account would not reduce Prior's obligations, but would be used for enhancement of the PAC. (Id.). In the event the College used the pledged sum or any income therefrom for any purpose other than that set forth in the Pledge Letter, or if the College were to materially violate or fail to comply with any terms in the Pledge Letter and such violation or failure should continue for one year after notification from Prior, then Prior would have the right to require the College to apply all amounts theretofore paid by Prior pursuant to the Pledge Letter to the Prior Family Foundation. (Id.). The Pledge Letter required that it be approved by the Board of Trustees and stated that Prior would have no obligations pursuant to the Pledge Letter until the Board of Trustee's approval. (Id. at ¶ 14). Prior made annual contributions from 2012 to 2016 totaling just under $18 million. (Docket #1 at ¶ 23).

In 2015, the President of Holy Cross informed the Board of Trustees that its athletic facility still required an additional $3 million in pledges to meet a then-recently adopted policy of not beginning construction on any project prior to receiving pledges covering 67% of the projected costs. (Id. at ¶ 25). Prior did not have an interest in or the intention to help fund the athletic facility project. (Id. at ¶ 26). However, to get Holy Cross to commence development of the PAC without further delay, Prior donated the approximately $3 million reported as necessary to commence construction of the athletic center so that the athletic center project would no longer act as a block on the pursuit of the PAC project. (Id.). While awaiting the PAC project to begin, the College decided to advance construction of an off-campus retreat center at a cost of $30 million. (Id. at ¶ 28).

In 2022, as Holy Cross neared completion of the PAC, the College proposed to host an Opening Concert on December 16, 2022, with music commissioned by Prior and composed by Ozvaldo Golifor specifically intended for performance at the Opening Concert by Johnny

4

Gandelsmann and the Knights Orchestra of New York City. (Docket #1 at ¶ 31). On August 31, 2022, the College received a Certificate of Occupancy for the PAC and sent Prior an email to inform him of the same on September 7, 2022.² (Docket #6-1 at 2; Docket #11-2 at 3). Two days later, Prior toured the PAC and attended a formal reception in the space to celebrate its opening. (Docket #6 at 9). Prior asked for a meeting with senior management of the College to be held on November 3, 2022, the date of the PAC theater opening, to discuss how his money had been held, invested, and used in order to determine whether to further fund the PAC. (Docket #1 at ¶ 32). Instead of agreeing to meet with Prior, two representatives of the Board of Trustee's Executive Committee called Prior the next day demanding that he pay the $7 million balance on his $25 million commitment to the College within five days, or the College would cancel the Opening Concert. (Id. at ¶ 33). The College cancelled the Knights Orchestra's engagement shortly after making its demand without waiting for the expiration of the five-day period. (Id. at ¶ 34). Prior made no further payments to the College.

On September 13, 2023, Prior filed the instant action asserting claims for breach of fiduciary duty and breach of contract and seeking an accounting and a declaratory judgment that the College stands in material breach of its obligations under the Pledge Letter such that the Pledge Letter provides no enforceable rights or benefits to the College and imposes no enforceable obligation on Prior. (Id. at ¶¶ 39-61). On September 29, 2023, the College filed the motion at issue seeking to compel mediation and arbitration of the claims raised in the complaint pursuant to paragraph 10 of the Pledge Letter. (Docket #5). Paragraph 10 provides, in relevant part:

> [Prior] and the College agree that if an issue arises relating to whether any condition for making any payments described in Paragraph 6 of the Agreement has been satisfied, and if the issue cannot be settled through direct discussions, [Prior] and

---

² Pursuant to Paragraph 6 of the Pledge Letter, a Certificate of Occupancy triggered the final $5 million payment within 30 days. (See Docket #6-1 at 6).

> the College agree to endeavor to resolve the issue by mediation. If [Prior] and the College cannot agree as to whether a condition for making any payments described in Paragraph 6 of the Agreement has been satisfied, then such issue shall be settled by arbitration between the parties.[3]

(Docket #6-1 at 7-8). Prior opposes the motion arguing that the Pledge Letter is not a binding agreement and that, even if it were, the claims asserted by Prior in the complaint are outside the scope of the arbitration clause. (Docket #10).

## II.     LEGAL STANDARD

The Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1 et seq., provides that agreements to arbitrate "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."[4]  9 U.S.C. § 2.  The FAA embodies a "liberal federal policy favoring arbitration."  AT&T Mobility LLC v. Concepcion, 563 U.S. 333, 339 (2011) (internal citations and quotations omitted).  That policy requires "ambiguities as to the scope of the arbitration clause itself [to be] resolved in favor of arbitration."  Ouadani v. TF Final Mile LLC, 876 F.3d 31, 36 (1st Cir. 2017) (quoting Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Sandford Junior Univ., 489 U.S. 468, 476 (1989)) (alterations in original).

In spite of the strong federal policy favoring arbitration, the Supreme Court has made clear that "arbitration is a matter of contract and a party cannot be required to submit to arbitration any

---

[3] At the hearing on August 2, 2024, I indicated I was unsure whether the parties had yet to engage in direct discussions as required prior to mediation and arbitration under paragraph 10 of the Pledge Letter. (Docket #28 at 87). While taking the matter under advisement, I ordered the parties to engage in direct discussions, where, in order to be meaningful, the College would provide an accounting to Prior. (Docket #27). The parties engaged in direct discussions on September 25, 2024 and October 30, 2024. (Dockets #42, 43). While the College provided additional records to Prior, Prior objects to the adequacy of the College's accounting. (Docket #43 at 5-6).

I note that the parties were not able to resolve any of the matters at issue during their direct discussions. This lack of resolution clarifies, contrary to Prior's argument, (see Docket #14 at 7), that any additional meet and confer obligations beyond what took place between the parties prior to filing the instant motion would not have narrowed any of the issues currently before the court.

[4] The College asserts that the FAA applies to the instant case. (Docket #6 at 11).  Because Prior has not argued that the Massachusetts arbitration statute applies instead, I will analyze this case under the FAA.  (See Docket #10 at 9).

6

dispute which he has not agreed so to submit." AT&T Techs., Inc. v. Communs. Workers of Am., 475 U.S. 643, 648 (1986) (quoting United Steelworkers v. Warrior & Gulf Navig. Co., 363 U.S. 574, 582 (1960)); see Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp., 559 U.S. 662, 681 (2010) ("arbitration is a matter of consent, not coercion"). A party seeking to compel arbitration "must show [1] that a valid agreement to arbitrate exists, [2] that the movant is entitled to invoke the arbitration clause, [3] that the other party is bound by that clause, and [4] that the claim asserted comes within the clause's scope." InterGen N.V. v. Grina, 344 F.3d 134, 142 (1st Cir. 2003). Prior argues that the College has failed to prove the first and fourth of these requirements.[5] (Docket #10).

IV.    ANALYSIS

A.    Does a Valid Agreement to Arbitrate Exist?

When deciding a motion to compel arbitration, a court must first determine "whether . . . there exists a written agreement to arbitrate[.]" Lenfest v. Verizon Enter. Solutions, 52 F. Supp. 3d 259, 263 (D. Mass. 2014). "If the contract containing the arbitration agreement was never binding on the Plaintiffs, the arbitration clause cannot be enforced against them." Perez-Tejada v. Mattress Firm, Inc., No. 17-12448-DJC, at *4 (Feb. 21, 2019) (quotation and alterations omitted). Prior, citing paragraph 14 of the Pledge Letter, argues that the Pledge Letter is not binding and thus the College cannot enforce the arbitration clause of paragraph 10 against him. (Docket #10 at 11).

Paragraph 14 of the Pledge Letter provides:

Given its importance and specific performance requirements by the College, (i) [Prior] expressly acknowledges that this gift agreement must be approved by the

---

[5] At the hearing and within the papers, the parties have vigorously argued that the opposing side breached their agreement. However, whether or not a party breached the agreement is not within my authority and jurisdiction. Rather, I have been tasked with determining only whether these claims are subject to arbitration and this opinion is so limited.

7

> College's Board of Trustees, and (ii) the College expressly acknowledges that [Prior] has no obligations pursuant to this Agreement until said Agreement is approved by the College's Board of Trustees.

(Docket #6-1 at 8). Prior argues that this provision required the Board of Trustees to vote to approve the Pledge Letter in order for it to be enforceable. (Docket #10 at 11). The College argues that this condition was satisfied when the Board of Trustee's Executive Committee unanimously approved the Pledge Letter on February 26, 2014. (Dockets #6 at 5, #6-1 at 2, 13). Here, the College has the better argument, and the record otherwise supports its position.

At the May 3, 2014 Board meeting, the Board approved the minutes of the Executive Committee meeting of February 26, 2014. (Id. at 15). Prior, then serving in his second tenure as a member of the Board, acknowledges that he was in attendance at the May 3 Board meeting. (Id.). However, Prior avers that the Board was asked only to accept the minutes of the Executive Committee meetings, including the February 26, 2014 minutes reflecting the approval of the Pledge Letter, but was not asked to approve or ratify the Executive Committee's actions themselves. (Docket #11 at ¶¶ 8-9). In support of the argument that the Board never approved the Pledge Letter as required by paragraph 14, Prior further avers that the Board was not provided a copy of the Pledge Agreement and that the Board was not asked to vote for its approval. (Docket #11 at ¶¶ 8-9).

While Prior's affidavit appears to accurately recount the relevant part of the May 3, 2014 Board agenda and actions, it overlooks the operation of the College's Bylaws. Subject to exceptions not relevant here, Article IV of the College's Bylaws provides that, between meetings of the Board, the Executive Committee "shall have all of the powers and duties of the [B]oard."[6] (Docket #6-1 at 11). At each meeting of the Board, the proceedings and actions taken by the

---

[6] The Executive Committee comprises five to six Board members elected by the Board, the chair of the Board of Trustees, and the College President. (Docket #6-1 at 11).

Executive Committee in between Board meetings shall be reported to the Board, and the minutes of all proceedings of the Executive Committee shall be distributed to each member of the Board after such minutes shall have been approved by the Executive Committee. (Id.). These same Bylaws also provide that the Board shall retain the power to rescind any vote or resolution of the Executive Committee. (Id.).

Hence, the absence of a Board vote to ratify the Executive Committee's approval of the Pledge Letter does not establish that the Board did not, as required by paragraph 14, approve the Pledge Letter. Rather, given that the Executive Committee has all the powers and duties of the Board, that on February 26, 2014, the Executive Committee approved the Pledge Letter, that the Executive Committee's action was reported to the Board as reflected in the May 3, 2014 Board minutes, and that there is no evidence in the minutes of the May 3 meeting that the Board exercised its power to rescind the Executive Committee's approval of the Pledge Letter, the opposite is true: that is, the Board approved the Pledge Letter and paragraph 14's requirement was satisfied.

Moreover, the record indicates that Prior fully understood, even anticipated, that the Executive Committee could and likely would act for the Board. On the date the Pledge Letter was signed, Prior was serving his second tenure as a Board Trustee and fully understood the practical operation of the Board through the Executive Committee. Indeed, on February 14, 2014, Mike Lochhead, College Vice President for Administration and Finance, emailed Prior reporting that "[o]nce there is final agreement on the [Pledge Letter], I will work with the President's Office to set-up a meeting/process whereby the Board/Executive Committee will have a chance to review and approve." (Docket #13-2 at 7). In response, far from raising any concern, Prior wrote, "Looks good to me. I have sent it to my personal lawyer at Fried Frank for a final blessing." (Id.).

9

In addition, there is no evidence in the record that before Spring 2023, Prior ever questioned whether Paragraph 14's requirement for Board approval of the Pledge Letter was not effected by the Executive Committee's February 26, 2014 approval and the Board's at least implicit adoption of the Executive Committee's vote. (See Docket #12-4). In fact, in a November 7, 2022 email to the College in which he stated that he would "pay [the College] not one dollar more," Prior himself invoked the Pledge Letter stating:

> Keep reading and you will find in Section 10 that very civilized paragraph suggesting that in case of a disagreement about payment . . . the parties engage in direct discussion, then go to mediation if such discussions fail and finally to arbitration should mediation and discussion fail.

(Docket #6 at 2). And then on November 17, 2022, Prior wrote to the College, "I am moving to mediation and have engaged counsel for the effort." (Id. at 10). On November 19, 2022, Prior followed up with a message in which he discussed "the requirement for mediation and arbitration" in the Pledge Letter.[7] (Id.).

In support of his challenge to the enforceability of the Pledge Letter, Prior argues that the parties could not have deemed a February 26 approval of the Executive Committee to satisfy the requirement for Board approval since the Pledge Letter is dated February 28, two days after the Executive Committee vote. (Docket #10 at 11). He further argues that, even if Executive Committee approval was significant, the Executive Committee's vote is based on a draft Pledge Letter dated July 26, 2013, and "the Parties signed a version of the pledge letter that had been amended following the Executive Committee's review on February 26, 2014." (Docket #21 at 3-4). The latter argument borders on disingenuous; the draft before the Executive Committee is identical to the February 28, 2014 Pledge Letter with two non-material changes: the date and the

---

[7] While these assertions are made in the College's memorandum in support of the instant motion and the court was not provided the original emails, Prior has not disputed the contents thereof.

signature of the parties. (Compare Docket #6-1 at 5-9 with Docket #20-1 at 11-15). The former argument fares no better. Prior makes no compelling argument for why the timing of the signatures would be significant absent material changes to the agreement nor is there a temporal requirement within paragraph 14 or the rest of the Pledge Letter requiring the parties to have signed the Pledge Letter prior to its approval by the Board.

B.     Do the Claims in the Complaint Come within the Scope of the Arbitration Provision?

Prior argues forcefully that the claims in his complaint are not within the scope of the mediation and arbitration provision of paragraph 10 of the Pledge Letter. Comparing the allegations in his complaint with the language of paragraph 10, I find Prior's argument unpersuasive.

Prior brings claims for breach of fiduciary duty and breach of contract and seeks an accounting and a declaratory judgment that the College has breached its obligations under the Pledge Letter. (Id. at ¶¶ 39-61). In relevant part, in his complaint he alleges:

> 21.     Mr. Prior made clear that he was earnest in his offer to contribute $25,000,000.00 should the College commit to honor its faculty's recommendation for the urgent development of a PAC by donating an initial $2,000,000.00 toward that cause in December 2012.
>
> 22.     Thereafter, the parties discussed specific terms for Mr. Prior's pledge and the College's commitment to use his donations solely and promptly for development of a PAC. Eventually, a written pledge agreement was prepared and signed by the parties in the form of a letter dated February 28, 2014 ("Pledge Letter").
>
> 23.     Mr. Prior made further contributions to Holy Cross in reliance upon its promises to hold his contributions (including the donation he made in December 2012) in a segregated account for the sole use of funding the prompt and continuous development of a PAC. Mr. Prior further relied upon Holy Cross's promise to use his donations and all income to be earned on his donations for the benefit of the prompt development of a PAC when making further contributions annually from 2012 to 2016 totaling just under $18,000,000.00 (the "Conditional Donations").

> 24.   Holy Cross understood and agreed that it could not keep and use Mr. Prior's Conditional Donations unless held in a segregated account, invested solely for the benefit of the PAC, and used solely for the prompt and continuous development of the PAC. . . .
>
> 25.   Holy Cross did not honor its agreement . . .
>
> 29.   Holy Cross never documented how it held Mr. Prior's Conditional Donations to assure him that they were accounted for in a segregated account, nor has it documented its investments of and income earned from the Conditional Donations over the many years of delay, nor the specific expenses paid with his funds in order to demonstrate the Conditional Donations have been sued solely for construction of the PAC[.]

(Docket #1).  As these allegations show, the essence of Prior's complaint is that Prior agreed to make what he calls his "Conditional Donations," (totaling $25,000,000) and that the conditions for making such donations were that Holy Cross keep all such donations in an account funded solely by such donations and income earned therefrom, use such donations and income exclusively for designing, building, and otherwise developing the PAC, and do so "promptly;" and that Holy Cross, having received some $18,000,000 in Conditional Donations, breached its contractual agreement and fiduciary duties.

Interpreting any ambiguities as to the scope of the arbitration clause in favor of arbitration, I find that these allegations are within the scope of the agreement to submit to mediation and arbitration "an issue relating to whether any condition for making payments described in Paragraph 6 of the Agreement has been satisfied."  In doing so, I refute Prior's assumption that the language "described in Paragraph 6 of the Agreement" modifies "any condition" and not "any payments."

Paragraph 6 links Prior's obligation to donate $5 million to the following dates or events:

- the first installment due on the later of January 31, 2015, or 30 days after the selection of the architect and the site and the construction contract signed;

- the second installment due on the later of January 31, 2016, or 30 days after breaking ground;

12

- the third installment due on January 31, 2017, or 30 days after the College certifies diligent prosecution of construction; and

- the last installment due on the later of January 31, 2018, or 30 days after receipt of the certificate of occupancy.

(Docket #6-1 at 6). Certainly, these links can be called conditions which required satisfaction before Prior's obligation to perform ripened. However, these were not the only conditions the College had to satisfy before Prior was obligated to donate. For instance, if after breaking ground, but before making the second $5 million installment, Prior learned that Holy Cross diverted some of the first installment to refurbishing administrative offices, or that the College had deposited some portion of the first $5 million into a general expense fund, then Prior could claim the College breached paragraph 8 of the Pledge Letter and avoid the obligation to make the second $5 million installment. See Lease-It, Inc. v. Mass. Port Auth., 33 Mass. App. Ct. 391, 397 (1992) ("It is well established that a material breach by one party excuses the other party from further performance under the contract."). By this same logic, here, "any condition" refers not only to the construction milestones in paragraph 6, but to the more fundamental conditions of the Pledge Letter which must be satisfied before obligating Prior to donate. Indeed, these fundamental conditions of the Pledge Letter – segregating donations and income earned therefrom which served the fundamental condition that the donations and income be committed exclusively to the PAC – were so important to Prior that paragraph 9 of the Pledge Letter provides that the College's failure to abide by such conditions shall entitle Prior to require all his donations and the income thereon to be returned to charity. (Docket #6-1 at 3). Given that Prior's obligation to donate depended not only on the paragraph 6 construction milestones, but also upon the College scrupulously adhering to how it handled Prior's donations, paragraph 10 is best read as follows: "described in Paragraph 6 of the Agreement" modifies or refers to the four installment payments set forth in that paragraph. "Any

13

condition for making" refers not only to the construction milestones linking an event to a payment obligation, but also to the fundamental conditions the College was obligated to satisfy over the course of this agreement – the duty to keep all such donations in an account funded solely by such donations and income earned therefrom and to use such donations and income exclusively for designing, building, and otherwise developing the PAC.

I appreciate that good lawyers can almost always argue that words are subject to more than one interpretation – that is certainly true here. However, the FAA's liberal policy favoring arbitration requires that any ambiguities as to the scope of an arbitration clause be resolved in favor of arbitration. Thus, I read paragraph 10 to require all of Prior's claims to be prosecuted according to the protocol set forth in that paragraph.

V.   CONCLUSION

For the foregoing reasons, I order that the motion to compel mediation and arbitration (Docket #5) be ALLOWED. The parties are hereby ORDERED to confer with the goal of establishing a process for choosing and appointing a mediation forum/venue and a mediator and an arbitration forum/venue and arbitrator should mediation fail. Within 14 days of this Order, the parties shall file a joint report summarizing a list of mutually accepted options for a mediator and arbitrator from which this Court may make a referral order. This case shall be STAYED pending the completion of mediation and/or arbitration pursuant to 9 U.S.C. § 3.

/s/ David H. Hennessy
David H. Hennessy
United States Magistrate Judge